# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

        Plaintiff,

vs.                                                    NO. 09-CR-2985 JEC

ALAN CURTIS TUKES,

        Defendant.

## MEMORANDUM OPINION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

THIS MATTER came before the Court on Defendant's Motion to Suppress Evidence and Statements, filed May 21, 2010 (Doc. 89) ("Motion"). I have considered the Motion, the government's response, the relevant authority, and held an evidentiary hearing on June 24, 2010. I denied the Motion orally at the close of the evidentiary hearing and I now enter this Memorandum Opinion and Order recording my findings in satisfaction of my obligations under Rule 12(d) of the Federal Rules of Criminal Procedure, which requires a court to state its essential findings on the record when deciding a motion that involves resolution of factual issues. Fed.R.Crim.P. 12(d).

**I.**    **Findings Of Fact**[1]

As a preliminary matter, the Court finds the June 24, 2010 hearing testimony from Sergeant Lou Heckroth of the Albuquerque Police Department, Detective Mike Hill of the

---

[1] The operative facts in this case are in large part undisputed.

Albuquerque Police Department, and Officer Troy Velasquez of the New Mexico State Police Department was credible.

On September 23, 2009, the Compass Bank located at 13140 Central Avenue in Albuquerque, New Mexico was robbed. Unbeknownst to the robber, the bank teller placed an electronic tracking system ("ETS") device in the currency he handed over. At approximately 10:30 that morning, New Mexico State Police (NMSP) Officer Troy Velasquez was on duty conducting radar operations with five other NMSP officers on Interstate 40 in Albuquerque. Officer Velasquez was advised via dispatch that the Albuquerque Police Department (APD) was requesting state police assistance in its effort to locate a vehicle initially described as a green van because the vehicle and its driver were involved in a bank robbery in Albuquerque. NMSP dispatch also indicated at that time that APD was tracking the vehicle through its specialized field equipment that communicated with an electronic device located in the stolen currency. The dispatch was soon updated, informing officers that the vehicle was a gray minivan bearing no license plate and was believed to be heading west on Interstate 40. It was unclear to Velasquez from the dispatch whether or not the suspect was armed.

Velasquez observed a van meeting the updated description pass him heading westbound on Interstate 40. Velasquez followed the gray minivan in his marked unit, noting that the van was traveling slower than the normal flow of traffic. Velasquez advised dispatch that he was following a gray van with no license plate, traveling westbound on Interstate 40 near the 134 mile marker, and requested another police unit for assistance. Velasquez advised dispatch that he did not intend to stop the van without another officer present.

As Officer Velasquez followed the van in the right lane on Interstate 40 West, a silver truck pulled up next to him in the left lane. The driver of the truck was APD Detective Hill, who

had been tracking the van through the electronic signal received by the equipment in his vehicle. Hill had extensive training and experience in the use of the specialized tracking equipment, which equipment indicated that the tracking device taken from Compass Bank was located in the van. Hill signaled to Velasquez, pointing to the van and showing Velasquez a police badge. Velasquez continued to follow the van while detailing his movements and informing dispatch that there was another police officer with him. As the three vehicles approached the 131 mile marker, the gray van signaled to exit the highway. Velasquez advised dispatch they were getting off Interstate 40 at the 131 exit. Velasquez and Hill exited the highway behind the van. The van slowed down and then pulled over to the shoulder of the off ramp and stopped without being signaled to do so. Velasquez pulled behind the van, activated his lights, and exited his police unit on the driver's side, using his door as a shield and with his weapon drawn for safety. He shouted directional commands to the driver of the van to come out of the vehicle, ordering the driver to show his hands and step out of the vehicle. The driver initially resisted but soon complied. Velasquez ordered the driver to walk backwards away from the vehicle, not knowing if anyone else was inside the van. Velasquez commanded the driver to his knees and then to his stomach, hands out to his sides. Hill provided cover for Velasquez as he approached Tukes and handcuffed him. Velasquez informed Tukes he was being detained but was not under arrest at that time. Velasquez asked Tukes if he had a driver's license and Tukes replied that it was in his wallet. Velasquez retrieved the Colorado license and sat Tukes up. Velasquez then ran a license, registration, and vehicle identification number (VIN) check. The driver of the van was identified as Allen Curtis Tukes and the van was registered to him.

     In the meantime, other officers including APD Sergeant Heckroth and Detective Gagne had arrived, though Velasquez had not seen them prior to handcuffing Tukes. Heckroth

conducted an investigation while Velasquez closed down the off ramp for safety.  Heckroth used the tracking equipment, which indicated the device was inside the van. It was necessary to deactivate the device immediately because (1) should another bank robbery occur, the signals could cross and send officers in the wrong direction, and (2) the evidence itself, the signaling device, had a limited transmission life fueled by battery and it would expire.  Accordingly, exigency existed.  Heckroth entered the van to retrieve the device and, once inside, found the strongest electronic signal coming from a backpack on the front passenger floorboard.  Heckroth and Gagne opened the pack.  Upon opening the pack to deactivate the device, Heckroth observed a large amount of United States currency and what appeared (given his training and experience) to be red dye consistent with the type used in exploding dye packs.  Detective Gagne removed small amounts of bills from the pack, placing them on the seat until he located the two bills between which the device was sandwiched.  Heckroth placed the bills containing the track pack in a "trap," a temporary deactivating device, to be sure the signal stopped emitting immediately.  Gagne and Heckroth placed the remaining currency back in the backpack inside the van.  Following the discovery of the ETS device and the currency inside the vehicle, Tukes was arrested.  Detective Hill later permanently disabled the tracking device by disconnecting the wires from the battery source.

      Sergeant Heckroth communicated with Special Agent Jeff Romero of the Federal Bureau of Investigation (FBI), who had by then arrived on the scene, to facilitate the FBI investigation to follow.  Sergeant Heckroth described to Agent Romero what he had observed when locating the tracking device inside the van.  Field officers also arrived, photographs were taken, and the van was sealed and towed to the FBI office in Albuquerque.  *See* Government's Hearing Exhibits 1-3.

On September 24, 2009, Agent Romero swore out an Affidavit in support of a search warrant to conduct a search of the van.  *See* Doc. 89-1 and Sealed Addendum thereto.  The warrant was issued.

## II.     Legal Standard

An investigative detention is an exception to the probable cause requirement.  *See Terry v. Ohio*, 392 U.S. 1, 26 (1968).  In *Terry*, the Supreme Court held that law enforcement may constitutionally "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause."  *Id.* at 30 (quoting *United States v. Sokolow*, 490 U.S. 1, 7(1989)).  Reasonable suspicion requires something less than probable cause, some "minimal level of objective justification."  *Sokolow*, 290 U.S. at 7 (quoting *INS v. Delgado*, 466 U.S. 210 (1984)). To determine whether a brief  detention is valid, courts consider the totality of the circumstances.  *Id.* at 8.

Probable cause is "a fair probability that contraband or evidence of a crime will be found."  *Illinois v. Gates*, 462 U.S. 213, 238 (1983).  Probable cause to arrest exists only when the facts and circumstances known to the officer are such that a person of reasonable caution would be warranted in believing that a criminal offense has been or is being committed.  *United States v. Cruz-Mendez*, 467 F.3d 1260, 1268 (10th Cir. 2006).  Probable cause is measured against an objective standard.  *Id.*

## III.    Discussion

    **A.**     **The Initial Detention of Tukes was Lawful and the Accompanying Show of Force was Necessary and Justified Under the Circumstances**

Where, as here, swift police action "predicated upon the on-the-spot observations of the officer on the beat" is called for, a flexible "reasonable suspicion" standard applies, which justifies police inquiry where specific and articulable facts exist that "taken together with rational inferences from those facts, reasonably warrant [an] intrusion." *Terry v. Ohio*, 392 U.S. at 21.

Here, Officer Velasquez had a reasonable, articulable suspicion that Tukes was the suspect believed to be involved in the robbery of the Compass Bank. Velasquez' suspicion was based on (1) the physical description from dispatch of a gray van bearing no licence plate, which matched the description of the vehicle Tukes was driving[2]; (2) the information from dispatch that the suspected vehicle was being tracked by an APD ETS device and was believed to be traveling west on Interstate 40; and (3) Officer Hill's appearance on the highway and his indications to Velasquez that he was another police officer in pursuit of the same van. Further, Tukes operated the vehicle at a rate slower than the normal flow of traffic and ultimately stopped on the off ramp of his own volition. Given this matrix of operative facts, Velasquez had sufficient basis to briefly detain Tukes.

That Velasquez drew his weapon, shouted commands at Tukes, and ordered him to the ground in a prone position was justified during the lawful investigative detention because Velasquez did not know how many people were in the van or whether the suspect was armed.

---

[2] "[A] vehicle's apparent failure to display some form of visible license plate/registration tag, temporary or permanent, gives rise to a reasonable suspicion that its driver might be violating any one of the multitude of applicable traffic and equipment regulations of the jurisdiction." *United States v. Edgerton*, 438 F.3d 1043, 1048 (10th Cir. 2006) (quotations omitted). Although Officer Velasquez did not identify the missing plate as the specific or sole reason for detaining Tukes, he acknowledged that this fact alone indeed provides legitimate justification for a traffic stop.

"[T]he Supreme Court established a bright-line rule that, during a lawful traffic stop, officers may order passengers out of the car as a matter of officer safety." *United States v. Ladeaux*, 454 F.3d 1107, 1110 (10th Cir. 2006) (citing *Maryland v. Wilson*, 519 U.S. 408, 415 (1997)). Additionally, more forceful techniques may be permissible during the course of an investigative detention if officers have a reasonable suspicion to be concerned for their safety. *See Adams v. Williams*, 407 U.S. 143, 146-47 (1972); *United States v. Gama-Bastidas*, 142 F.3d 1233, 1240 (10th Cir. 1998) ("[T]he use of firearms, handcuffs, and other forceful techniques are justified only by probable cause or when 'the circumstances reasonably warrant such measures.'"). With particular regard to the use of handcuffs during the detention, the Tenth Circuit recently reiterated:

> Handcuffing may be appropriate during an investigative detention - an investigative detention does not become unreasonable just because officers handcuff an individual. Officers are authorized to handcuff individuals during the course of investigative detentions if doing so is reasonably necessary to protect their personal safety or maintain the status quo. However, the use of handcuffs is greater than a *de minimus* intrusion and thus requires the government to demonstrate that the facts available to the officer would warrant a man of reasonable caution in the belief that the action taken was appropriate.

*Lundstrom v. Romero*, __ F.3d ____, 2010 WL 3222048, 8 (10th Cir. 2010) (internal quotations and citations omitted).

      Here, Velasquez was conducting a felony stop of a suspected bank robber and had received mixed messages from dispatch as to whether the robbery suspect was armed. The suspect was driving a minivan – a vehicle large enough to hold many passengers. These circumstances present a situation reasonably likely to involve weapons or violence, and Velasquez' actions aimed at safety and self preservation were warranted. The Court finds the facts available to Officer Velasquez at the time of the initial detention would warrant a man of

reasonable caution to believe the action he took was appropriate.

### B. The Warrantless Entry Into Tukes' Van to Disengage the ETS Device was Lawful

Next, the Court finds that Detective Hill and Sergeant Heckroth were justified in entering the van to disengage the tracking device. *See United States v. Reed*, 26 F.3d 523, 528-530 (5th Cir. 1994). Although the Tenth Circuit Court of Appeals has yet to pass on the particular question whether signals from an ETS device alone can provide the basis for a warrantless search of a vehicle, in *Reed*, the Fifth Circuit held that the signal emitted from a tracking device provided sufficient exigency for officers to enter the trunk of a vehicle without a warrant to locate and disable the tracking device. The *Reed* court reasoned that

> [t]hough the officers did not know for sure that another robbery would occur, leaving the car for the amount of time necessary to secure a warrant with the possibility of interfering with the ability to track another robbery was risky. Additionally, Reed had a diminished expectation of privacy in his car. *See United States v. Gaultney*, 581 F.2d 1137, 1144 (5th Cir. 1978)(citing *United States v. Chadwick*, 433 U.S. 1, 97 S. Ct. 2476, 53 L. Ed. 2d 538 (1977)). Further, due to the strength of the signal, the officers were reasonable in their belief that the trunk contained at least part of the money stolen from the credit union.

*Id*. at 530. In this case, the need to prevent the electronic device from potentially interfering with another robbery as well as the fleeting nature of the electronic signal leads this Court to the same logical conclusion that exigency was present.

### C. Tukes' Arrest was Lawful Following Discovery of Physical Evidence Linking Him to the Bank Robbery

The plain-view doctrine authorizes the seizure of evidence of a crime if (1) the officer was lawfully in a position from which the object seized was in plain view, (2) the object's incriminating character was immediately apparent (i.e., there was probable cause to believe it was contraband or evidence of a crime), and (3) the officer had a lawful right of access to the

8

object.  *United States v. Thomas*, 372 F.3d 1173, 1178 (10th Cir. 2004)**.**  Having determined that the entry into the van was lawful for the purpose of disabling the electronic tracking device determined to be inside the backpack, the Court further determines that the large amount of currency also located in the backpack was within Sergeant Heckroth's and Detective Hill's plain view.  As discussed, where an incriminating object is within plain view of an officer who is lawfully in a position to view it and access it, the Fourth Amendment is not implicated by its seizure.  Notably, the officers could have lawfully seized the currency in the backpack at that time, but did not.

It is clear that the physical evidence located in the van gave rise to probable cause to arrest.  Once the tracking device officers knew had been placed in the money stolen from Compass Bank, as well as a large amount of currency, were located in the vehicle being driven and owned by Tukes, probable cause to arrest was present.  Indeed, a warrantless search of the van incident to Tukes' lawful arrest was permissible at this time, though evidently was not conducted.

### C.     Defendant Did Not Establish Entitlement to a *Frank's* Hearing

In *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978), the Supreme Court held that in limited circumstances a defendant is entitled to an evidentiary hearing to determine whether a warrant was issued in reliance on a deliberately or recklessly false affidavit.  In order to justify a *Franks* hearing challenging the veracity of a sworn statement used by police to obtain a search warrant, a defendant must first establish by a preponderance of the evidence that officers intentionally or with reckless disregard for the truth omitted material information from, or included false information in, the affidavit in support of the warrant.  *United States v. Tisdale*, 248 F.3d 964, 973 (10th Cir. 2001).  A defendant cannot rely on conclusory statements, but

instead must support his position with "affidavits or sworn or otherwise reliable statements of witnesses . . . or [in the case that such cannot be provided] their absence [must be] satisfactorily explained." *Franks*, 438 U.S. at 171.  A defendant is entitled to an evidentiary hearing under *Franks* when he makes a substantial preliminary showing that both (1) a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the search warrant affidavit; and (2) the allegedly false statement is necessary to the finding of probable cause.  *Id.*  "To mandate an evidentiary hearing, the challenger's attacks must be more than conclusory and must be supported by more than a mere desire to cross examine." *Id.*

Here, Tukes requested a *Franks* hearing based on (1) Agent Romero's Affidavit not identifying the "source" of the information as an electronic tracking device and not an individual; (2) the fact that the affidavit did not specifically state that officers had previously entered the vehicle to deactivate the device when they saw physical evidence in plain view.  Defendant's argument regarding the incomplete disclosure of the "source" of the information implicating Tukes was mooted when the government provided a  sealed Addendum to the Affidavit in which Agent Romero indeed identified that "the Source outlined in paragraph 3 of the original affidavit" was an "Electronic Tracking System (ETS) Device given to banks and credit unions for the sole purpose of being given to bank robbers so that the police may track the electronic signal to the robber and prevent the robber from escaping  . . . ." Doc. 109, Ex. 1.   The issuing magistrate judge signed in receipt of the Addendum and the magistrate judge issued the warrant with full knowledge that Defendant Tukes was initially implicated via an electronic tracking device.

Regarding Tukes' additional arguments seeking to have the September 24, 2009 search warrant invalidated, the Court determined that even without the challenged information present

in the Affidavit, there was ample evidence to support a probable cause finding to issue a search warrant for Defendant Tukes' van based upon the description, the tracking device, and the large amount of currency.

### IV.     Conclusion

In summary, the officers had a reasonable, articulable suspicion that Tukes was involved in the bank robbery and were justified in detaining him briefly.  The force that accompanied the detention was necessary and reasonable for officer safety.  Further, the brief initial detention led to the discovery of physical evidence when police legitimately entered the vehicle for the purpose of locating and deactivating the ETS device and then saw in plain view the large amount of United States currency.  The ETS device and the large sum of currency sufficiently connected Tukes to the bank robbery and gave rise to probable cause for his arrest.  Finally, Tukes failed to establish entitlement to a *Franks* hearing regarding Agent Romero's September 24, 2009 sworn affidavit in support of the warrant.

WHEREFORE,

**IT IS ORDERED** that Defendant's Motion to Suppress Evidence and Statements, filed May 21, 2010 (Doc. 89) is **DENIED.**

Dated October 6, 2010.

_____
SENIOR UNITED STATES DISTRICT JUDGE